UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Clayton James Hanks,

Plaintiff,

vs.                                        REPORT AND RECOMMENDATION

David Prachar, acting in his
individual and official
Capacity as Administrator of the
St. Louis County Jail, and
employees of the St. Louis
County Jail acting in their
official and individual capacities,
including; Bradford Keeney
(deceased); and Penny Wietman,

Defendants.          Civ. No. 02-4045 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a special assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the Defendants' Motion for Summary Judgment. A

Hearing on the Motion was conducted on August 28, 2008, at which time, the Plaintiff

appeared by Matthew K. Begeske, Esq., and the Defendants David Prachar

("Prachar"), Brad Keeney ("Keeney"),[1] and Penny Wietman ("Wietman"), appeared by Thomas G. Stanley, Assistant St. Louis County Attorney.

For reasons which follow, we recommend that the Defendants' Motion for Summary Judgment be granted, except as to the Plaintiffs' claim that the Defendants, in their individual capacities, violated his due process rights by the intensity, and duration, of his being kept in restraints.

## II. Factual and Procedural History

The Plaintiff is currently incarcerated at the Minnesota Correctional Facility, in Stillwater, Minnesota ("MCF-Stillwater"). Each of the named Defendants was employed by the County of St. Louis, Minnesota, at the St. Louis County Jail (the "Jail"), where the Plaintiff was being held as a pretrial detainee. In his Amended Complaint, the Plaintiff claims that he has suffered extensive physical, and emotional damage, as a result of the Defendants "unconstitutional use of excessive force, restraint, discipline and punishment upon him and the unconstitutional failure to protect and care for him by Defendants." Docket No. 77, at ¶1. The Plaintiff has

---

[1]At the Hearing, the Plaintiff agreed to voluntarily dismiss his claims against Keeney, and therefore, those claims should be dismissed, and we do not address them further.

brought his action under Title 42 U.S.C. §§1983, and 1988, and the Fourth, Eighth, and Fourteenth Amendments, to the United State Constitution.  Id. at ¶2.

By way of additional background, on December 23, 2003, we denied the Plaintiff's previous Motion for Leave to Amend his Complaint, and on August 23, 2004, we recommended that the Defendants' previous Motion for Summary Judgment be granted.  See, Docket Nos. 29 and 34.  The District Court adopted our Report and Recommendation, see, Docket No. 42, but, on August 4, 2006, the United States Court of Appeals for the Eighth Circuit reversed, and remanded the matter to the District Court for further proceedings consistent with its Opinion.  See, Hanks v. Prachar, 457 F.3d 774, 776 (8th Cir. 2006).

Specifically, the Court of Appeals found that we had "erred by ignoring Hanks's request, in his preservice challenge to the denial of appointed counsel, for permission to resubmit his complaint with a correction as to the capacity in which he was suing defendants."  Id. at 775.  The opinion further noted that it was an abuse of discretion to deny the Plaintiff leave to amend, as the delay in the amendment was insufficient to create any prejudice to the named Defendants, since they were sued in their official capacities, and had been sued in their individual capacities in another concurrently filed suit.  Id.  Finally, the Court of Appeals noted that "the Jail's

- 3 -

restraint policy on its face is consistent with the standards announced in <u>Bell</u> but there are trialworthy issues as to the application of the policy to Hanks."[2]  <u>Id.</u> at 776.  On remand, we granted the Plaintiff's Motion to Amend his Complaint, so as to add his Fourth Amendment claim, and in order to permit him to sue the Defendants in both their individual and official capacities.[3]  See, <u>Order</u>, <u>Docket No. 76</u>.  The operative facts may be briefly summarized.

On April 3, 1998, the Plaintiff was first admitted to the Jail, as a detainee.  See, <u>Affidavit of David Prachar ("Prachar Aff.")</u>, <u>Docket No. 32</u>, ¶11.  At that time, the Plaintiff was seventeen (17) years old, but he had been certified as an adult by the Court which directed his detention.  <u>Id.</u>  On April 21, 1998, the Jail received complaints from the Duluth Holiday Inn, that the innkeepers had received numerous threatening phone calls from the Jail.  <u>Id.</u>, ¶20.  The Jail discovered that forty six (46) phone calls had been placed, from Sigma C -- the housing unit where the Plaintiff was

---

[2]In <u>Bell v. Wolfish</u>, 441 U.S. 520, 535-37 (1979), the Supreme Court ruled that pretrial detainees could be subjected to restrictions so long as the restrictions did not amount to punishment.  The Court determined that, if there were no intent to punish, then the question was "whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry * * * "  <u>Id.</u> at 537-38.

[3]Earlier, the Plaintiff had proceeded <u>pro</u> <u>se</u> but, on remand, he retained legal counsel who continues to represent his legal interests.

- 4 -

being detained -- and the Plaintiff was suspected of having made the calls.  Id.  On April 24, 1998, a disciplinary report was filed against the Plaintiff, after he had allegedly made over four hundred (400) calls to two (2) individuals, of which, at least some of the calls were made while the Plaintiff was in the Jail.  Id., ¶21.

The following day, the Plaintiff broke a window, and a sprinkler head, which caused his cell to flood, and forced the Jail to shut down its fire safety water supply for half of the Jail.  Id., ¶¶22-23.  Afterwards, it was discovered that the Plaintiff had removed the handrail, and the fittings from the shower in Sigma C, and several notes found in his cell referenced beheading, gutting and eating people.  Id., ¶24.  As a result, the Plaintiff was placed in two-point restraints, in order to protect the staff, and to calm the Plaintiff.  Id.  During his time in two-point restraints, frequent well-being checks were performed, which are required to be completed in intervals that are not to exceed twenty minutes, and, by April 26, 1998, the Plaintiff was reduced from two-point to one-point restraints.  Id., ¶¶24-25.

On April 29, 1998, a Disciplinary Hearing was held, and the Plaintiff was found guilty of making intimidating phone calls, and he was sentenced to twenty (20) days of disciplinary segregation.  See, Thomas Stanley Affidavit ("Stanley Affidavit"), Docket No. 102, Exhibit B, Attachment 2, at 21.  On that same day, the Plaintiff

waived his right to a Hearing on the property damage charges, which stemmed from the incident on April 25, 1998, and he pled guilty to those charges.  <u>Id.</u>  The Plaintiff was sentenced to sixty (60) days of disciplinary segregation, which ran consecutively to his previous sentence of twenty (20) days.  <u>Id.</u>

Initially, the Plaintiff was not placed in any restraints while in disciplinary segregation.  See, <u>Prachar Aff.</u>, supra, ¶29.  However, on April 30, 1998, the Plaintiff managed to place a call to the United States Secret Service, in which he threatened to blow up a Federal building in St. Paul, Minnesota, unless the charges against a named individual were dropped.  See, <u>Prachar Aff.</u>, supra, ¶30; <u>Stanley Aff.</u>, supra, Exhibit B, Attachment 2, at 25.  Also on that date, the Plaintiff was banging on his door , yelling, and he had thrown pieces of paper on the dayroom floor.  <u>Id.</u>, at 27.  For that incident, the Plaintiff was placed in two-point restraints, and leg irons.  <u>Id.</u>

Based upon the Plaintiff's behavior, a special management plan ("SMP") was created, which required the Plaintiff to be in two-point restraints while in his cell, one-point restraints during meals, and cuffs and leg irons while showering.  See, <u>Prachar Aff.</u>, supra, ¶31.  A review of the Plaintiff's SMP was to be conducted three (3) days later, by which time, he had caused damage to his mattress.  <u>Id.</u>  On May 9, 1998, his counselor, Michael Wilseym ("Wilseym"), reported that "[r]estraints seem[ed] to be

the only thing that keeps [the Plaintiff] from being out of control," and that the Plaintiff had "NO self control." Stanley Aff., supra, Exhibit B, Attachment 2, at 34 [emphasis in original].

On May 22, 1998, the Plaintiff was released from the Jail, and was transported to the Brainerd State Hospital, in Brainerd, Minnesota, for a commitment assessment. See, Prachar Aff., supra, ¶34. On June 3, 1998, the Plaintiff was returned to the Jail, and he informed the correctional staff that the doctors at the Brainerd State Hospital found that he was not mentally ill. Id., ¶35. Based upon the Plaintiff's past behavior, a revised SMP was implemented, which required one-point restraints, and a review two (2) days later. See, Prachar Aff., supra, ¶35; Stanley Aff., supra, Exhibit B, Attachment 3, at 8.

On June 9, 1998, the Plaintiff's restraints were removed entirely but, approximately twelve (12) hours later, he made threatening statements about wanting to harm Wilseym, he flooded his cell, and he threatened "physical assaults from now on." Prachar Aff., supra, ¶36; Stanley Aff., supra, Exhibit B, Attachment 3, at 10-12. The Plaintiff continued to threaten staff, he damaged property and, on June 24, 1998, after impairing two (2) sets of handcuffs, he was placed in four-point restraints until the next day, when he was reduced to two-point restraints. See, Prachar Aff., supra,

¶¶40-42.  From that time, through the date of his initial release on August 24, 1998, the Plaintiff's SMP was continually reviewed, and revised, and as his behavior improved, less restraints were employed, so that, by August 4, 1998, he did not have any restraints on him at night, and there were no restraints placed on him from August 21, to August 24, 1998.  See, <u>Prachar Aff.</u>, supra, ¶¶43-44;  <u>Stanley Aff.</u>, supra, Exhibit B, Attachment 3, at 19-37.

The Plaintiff returned to the Jail on September 10, 1998, and, after making threatening calls to the CrimeStoppers tip line on September 17, 1998, the Plaintiff was placed in one-point restraints until the following day.  See, <u>Prachar Aff.</u>, supra, ¶¶45-46; <u>Stanley Aff.</u>, supra, Exhibit B, Attachment 4, at 4-5.  On October 20, 1998, the Jail received reports that the Plaintiff had been calling the CrimeStoppers hotline incessantly, and was leaving weird messages.  See, <u>Prachar Aff.</u>, supra, ¶47; <u>Stanley Aff.</u>, supra, Exhibit B, Attachment 4, at 14-15.  On October 21, 1998, the Plaintiff was placed in administrative segregation, but he was not restrained.  See, <u>Stanley Aff.</u>, supra, Exhibit B, Attachment 4, at 16.

The Plaintiff continued to be disruptive, including incidents where he threw a chair against a wall, threatened staff, damaged a telephone booth, and threatened his grandmother.  See, <u>Prachar Aff.</u>, supra, ¶48; <u>Stanley Aff.</u>, supra, Exhibit B,

Attachment 4, at 17-19; 21; 23.  As a result of some of those incidents, he was placed in four-point restraints from October 27, to October 28, 1998, and was lodged in disciplinary segregation for ten (10) days in January of 1999, after waiving his right to a Hearing.  See, Prachar Aff., supra, ¶48; Stanley Aff., supra, Exhibit B, Attachment 4, at 17-19; 24.  No restraints were required after October 28, 1998.  See, Prachar Aff., supra, ¶48.  The Plaintiff was released from the Jail, and went to prison, on March 12, 1999.  Id., ¶ 49.

The Defendants have now filed a Motion for Summary Judgment, in which they contend that the Plaintiff has failed to exhaust his administrative remedies, and that the Plaintiff's allegations do not implicate violations of his constitutional rights.  See, Memorandum in Support of Defendants' Second Motion for Summary Judgment ("Defendants' Memorandum in Support"), Docket No. 101, at 14, 18.  The Defendants further contend that the Jail employees are protected by qualified immunity, and that the Plaintiff cannot establish a Monell claim.[4]  Id. at 25-26.  Finally, the Defendants

---

[4]While the Plaintiff has not named any governmental unit as a Defendant, at the Hearing, the Plaintiff agreed that it was not a policy or custom which formed the basis for his claim, but rather, the misapplication of the policy caused the alleged constitutional violations.  Since the Plaintiff has not claimed that it was a policy or custom that caused the alleged constitutional violations, he has no basis for a Monell claim, and no basis to hold the individual Defendants liable in their official capacities.

(continued...)

argue that any State tort claims, which are alleged against the County, should be dismissed for lack of proper notice.[5]  Id. at 27.  The Plaintiff opposes the Defendants' Motion, and we address the parties' arguments in turn.

### III.  Discussion

A.    Standard of Review.  Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations.  See, Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1118 (8th Cir. 2006), citing Celotex Corp. v. Catrett, 477 U.S. 317, 327

---

(...continued)

See, Grayson v. Ross, 454 F.3d 802, 811 (8th Cir. 2006)("Policy or custom official-capacity liability is imposed by 42 U.S.C. §1983 only for 'constitutional deprivations visited pursuant to governmental "custom" even though such custom has not received formal approval through the body's official decisionmaking channels.'"), citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978); see also, Williams v. Davis, 200 F.3d 538, 539 (8th Cir. 2000)(citing Monell for the proposition that "§1983 liability attaches to government officials acting in their official capacity only for constitutional deprivation resulting from the execution of official policy or custom."). As a result, we recommend that the claims against the individual Defendants in their official capacities be dismissed with prejudice.

[5]The Record does not reveal whether the Plaintiff provided proper notice for any of his State tort claims.  The Plaintiff has not offered any evidence of proper notice, nor has he disagreed with the Defendants' objection.  Therefore, any State law tort claims should be dismissed for failure to give proper notice, under Minnesota Statutes Section 466.05(1).

(1986); <u>Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.</u>, 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977, 125 S. Ct. 1860 (2005). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, <u>Smutka v. City of Hutchinson</u>, 451 F.3d 522, 526 (8th Cir. 2006), citing <u>Mayer v. Nextel W. Corp.</u>, 318 F.3d 803, 806 (8th Cir. 2003); <u>Eide v. Grey Fox Technical Servs. Corp.</u>, 329 F.3d 600, 604 (8th Cir. 2003); <u>Philip v. Ford Motor Co.</u>, 328 F.3d 1020, 1023 (8th Cir. 2003). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Planned Parenthood of Minnesota/South Dakota v. Rounds</u>, 372 F.3d 969, 972 (8th Cir. 2004); <u>Fenney v. Dakota, Minnesota & Eastern R.R. Co.</u>, 327 F.3d 707, 711 (8th Cir. 2003).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's

response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. University of Minnesota, 408 F.3d 470, 474 (8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004); Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).

B.     Legal Analysis. Prior to analyzing the Plaintiff's claims, we first address whether, as the Defendants claim, the Plaintiff has failed to exhaust his administrative remedies.

1.      Exhaustion of Administrative Remedies.

a.      Standard of Review.  In <u>Jones v. Bock</u>, 549 U.S. 199, 203-204 (2007), the Supreme Court recently considered the role that a prisoner's failure to exhaust his administrative remedies should play in the context of deciding the merits of a claim under Section 1983.  The Court began its analysis by noting that requiring prisoners to exhaust their administrative remedies had the positive effect of allowing prison officials "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court" which, in turn, "has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record."  <u>Id.</u>, citing <u>Woodford v. Ngo</u>, 548 U.S. 81, 89, 95 (2006).

Those purposes served as the backdrop to the Court's consideration of the exhaustion requirement, which Congress included in the PLRA, and which provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

<u>Title 42 U.S.C. §1997e(a)</u>.

A prisoner is defined as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." Title 42 U.S.C. Section 1997e(h).

Accordingly, as a pretrial detainee, the Plaintiff is subject to the exhaustion mandate of the PLRA. See, e.g., Mitchell v. Dep't or Corrections, 2008 WL 744041 at *6 (S.D.N.Y., February 20, 2008)("The PLRA applies to claims asserted by pretrial detainees as well as sentenced prisoners."), aff'd in relevant part, 2008 WL 744039 (S.D.N.Y., March 19, 2008); Reynolds v. Curry County Sheriff Dep't Employees, 2008 WL 5146122 at *2 (D. Or., December 4, 2008)("The PLRA applies to pretrial detainees."), citing Title 42 U.S.C. §1997e(h) as "defining 'prisoner' to be 'any person * * * detained in any facility who is accused of * * * violations of criminal law.'"); Cole v. Lomax, 2001 WL 1906275 at *2 (W.D. Tenn., September 26, 2001) ("As this action involved a pretrial detainee in confinement, the Prison Litigation Reform Act ("PLRA") applies."), citing Title 42 U.S.C. §1997e(h).

Failure to exhaust is "an affirmative defense under the PLRA, and [therefore] inmates are not required to specifically plead or demonstrate exhaustion in their complaints." Jones v. Bock, supra at 216. Courts charged with determining

exhaustion should do so on case-by-case basis, with each prisoner's Complaint evaluated in light of its compliance with established prison grievance procedures. Id. at 218-19.

Prisoners are required to exhaust all "available" remedies before seeking relief under Section 1983. See, Woodford v. Ngo, supra at 85. Accordingly, the PLRA does not require the exhaustion of all remedies, but only those that are available. See, Title 42 U.S.C. Section 1997e(a); Boyles v. Park, 111 Fed.Appx. 861, 861 (8th Cir. 2004); Johnson v. Jones, 340 F.3d 624, 627 (8th Cir. 2003); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001). Our Court of Appeals has defined "available" as "capable of use for the accomplishment of a purpose; immediately utilizable * * * accessible." Miller v. Norris, supra at 740, citing Webster's Third New International Dictionary, at 150 (1986). However, prisoners must exhaust any available administrative procedures, even if the relief sought, such as monetary damages, is not available. See, Johnson v. Jones, supra at 627, citing Porter v. Nussle, 534 U.S. 516, 524 (2002); Lyon v. Vande Krol, 305 F.3d 806, 808 (8th Cir. 2002), citing Booth v. Churner, 532 U.S. 731, 737-41 (2001).

Furthermore, it does not matter whether the prisoner may have subjectively believed that there was no point in pursuing his administrative remedies. See, Lyon

v. Vande Krol, supra at 808;  Chelette v. Harris, 229 F.3d  684, 688 (8th Cir. 2000)

cert. denied, 531 U.S. 1156 (2001).   If exhaustion is not complete by the time of the

filing of the prisoner's Complaint, then dismissal is mandatory.  See, Johnson v.

Jones, supra at 627.   Prisoners have only been excused from complying with the

administrative procedures when correctional officials have prevented prisoners from

utilizing the procedures, or when the officials themselves have failed to comply with

the administrative procedures.  See, Miller v. Norris, supra at 740;  Foulk v. Charrier,

262 F.3d 687, 697-98 (8th Cir. 2001).

        b.     Legal Analysis.  The Jail's grievance procedure is detailed

in the Jail's Inmate Handbook.  See, Stanley Aff., supra, Exhibit D at 17.  A grievance

is defined as "an issue affecting an inmate in the area of health, welfare, or Services

of the Jail that is within the power of the Jail Staff to correct."  Id.  Personal disputes

between an inmate, and a staff member, are not grievable.  Id.  As the Handbook

reads:  "Inmates may file a grievance for all matters EXCEPT * * * Administrative

action to ensure the safety, security, and good order of the facility.  Id. [emphasis in

original].  Given its plain language, this provision discourages the filing of grievances

that are related to matters of "the safety, security, and good order of the facility."

- 16 -

While the Plaintiff concedes that he did not file a grievance concerning the Jail's use of restraints on him, see, <u>Stanley Aff.</u>, supra, Exhibit A, at 54:14-55:9, he contends that the grievance procedures were expressly unavailable to him, because his complaint related to an administrative decision that involved matters of safety, security, and the good order of the facility.   The Defendants disagree.   At his deposition, Prachar was asked about such assertedly not grievable actions, and the following exchange ensued:

> Q.   So your decisions to restrain Mr. Hanks based on safety and security are not grievable, correct?
>
> A.   That's not correct.
>
> Q.   That's not correct.  Well, then please explain to me how the administrative -- according to this rule --
>
> A.   Uh-huh.
>
> Q.   -- administrative actions to ensure safety, security, and good order of the facilities.  And you just testified --
>
> A.   Uh-huh.
>
> Q.   -- that the reasons that you restrained Mr. Hanks was for the safety of your staff.
>
> A.   Uh-huh.

Q.    The safety of Mr. Hanks.

A.    Uh-huh.

Q.    And to maintain the order of the facility.

A.    And to maintain the order of the facility, that's correct.

Q.    And you're the Chief Administrator.

A.    That's correct.

Q:    And according to this handbook, that's a non-grievable action.

A:    Inmates can grieve anything at anytime for any reason.  And those grievances can be reviewed and denied for basic reasons. And 1 of the 3 reasons is: Court orders, disciplinary hearings, administrative actions; they can do that.  One of the things we look at [] under this rule is, if we impose a look-down facility-wide between 13:00 and 13:30 every day, [inmates don't want that.  They might grieve that. That's not a grievable issue because that's for the safety, security, and good order of the facility. That's a facility-wide issue.  Individual grievances, if they're feeling they're being wronged, certainly they can grieve that and it would be reviewed --

Q:    All right.

- 18 -

A:      -- to determine if they're grievable matters or not.
Stanley Aff., supra, Exhibit B, at 90:13-91:24; and, Exhibit G, ¶ 8 ( "A grievance can be denied if the action being grieved is related to the safety or security of the facility," but "there is no prohibition on bringing or filing such a grievance.").

While informative, Prachar's testimony fails to address the Plaintiff's principal concern, which is why the Handbook's language discourages the filing of grievances on such amorphous bases as safety, security, and good order.  Even in the example employed by Prachar, we fail to see why an everyday, facility-wide look-down would not be grievable if there were not basis for the lockdowns other the malevolence of the Jail's staff.[6]

_____

[6]The unfortunate consequence of the Handbook's language -- if, indeed, it discourages inmates from internally filing grievances -- could be the Jail's forfeiture of the many benefits of exhaustion.  As our Court of Appeals explained, in Johnson v. Jones, 340 F.3d 624, 626-27 (8th Cir. 2003), quoting Porter v. Nussle, 534 U.S. 516, 524-25 (2002)[internal quotations and citations omitted]:

> Beyond doubt, Congress enacted [the PLRA] to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.  In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation.  In other instances, the internal review might filter out some frivolous claims.  And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that

(continued...)

Nonetheless, if this were the only evidence on the question, we would be inclined to agree with Prachar that the language of the Handbook, in and of itself, would be an insufficient hurdle to quell an inmate's interest in grieving circumstances of personal restraint which he regarded as unwarranted, and hurtful, or unconstitutional. In <u>Booth v. Churner</u>, supra at 736, the Supreme Court considered "whether or not a remedial scheme is 'available' where * * * the administrative process has authority to take some action in response to a complaint, but not the remedial action an inmate demands to the exclusion of all other forms of redress." The Court ultimately held that, in enacting the PLRA, Congress "mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." <u>Id.</u> at 741. Simply put, the Court would "not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." <u>Id.</u> at 741 n. 6, citing <u>McCarthy v. Madigan</u>, 503 U.S. 140, 144 (1992).

Given the Court's holding in <u>Booth</u>, we are hard-pressed to conclude that, while futility, and the absence of monetary relief -- even when that is the only relief being sought -- do not provide exceptions to the exhaustion requirement, the Handbook

---

[6](...continued)
clarifies the contours of the controversy.

language, which is at issue here, presented a greater barrier to an inmate's filing of a

grievance, or of exhausting the administrative process that is available at the Jail.

While filing a grievance at the Jail, on matters of safety, security, and the good order

of the facility, would appear to be a futile act -- at least in view of Prachar's testimony

-- there can be no doubt that a grievance procedure was "available" at the Jail, and any

grievance, which would have been filed under that procedure, would have received

a response -- albeit a rejection.

However, the language of the Handbook does not stand alone, for the Plaintiff

has testified that Prachar informed him, expressly, that he could not grieve the subject

of his restraints.

> Q.     Did you ever file any grievances at all when you
>        were there in 1998 and 1999?
>
> A.     I wrote green slips.[7]  Grievances weren't allowed for
>        what I was grieving about.  For instance, the very
>        fact of being chained down, I remember asking for a
>        pen and pencil -- or a pen and paper and a grievance
>        form, and they asked me why did I want it.  I said I
>        want to grieve the fact that I'm still in chains,
>        because I thought maybe a couple of hours and I
>        should be let up.   In my thinking from being

---

[7]Green slips are forms in which inmates can make requests.  See, <u>Stanley Aff.</u>,
supra, Exhibit G, at ¶11.  After those requests are acted upon, copies are to be placed
in the inmate's file.  <u>Id.</u>

>restrained before, that's usually what happens.  But
>to be chained for days, I wanted to grieve it.  Dave
>Prachar right out of his own mouth when he came
>down to see me -- he'd come visit me early in the
>mornings usually or right after lunch he'd come see
>me.   Right out of his own mouth is I'm a jail
>administrator, this is my decision, you can't grieve
>our decisions.  He would say it like I'm an idiot.
>Like he said you should know this by reading our
>own rule book, and you don't know you can't grieve
>these things.

Stanley Aff., supra, Exhibit A, at 54:14-55:9.

When asked why he did not grieve certain of the complaints he had during periods

when he was in restraints, the following dialogue occurred:

>Q.   I've never seen a grievance on it.

>A.   Well, yeah, a lot of the times they would bring me
>my grievance bak and say you cannot grieve this
>issue in this jail, and they would give it to me and
>say throw it away or they would throw it away.

>           *      *      *

>Q.   I know there's some [grievances] from 2001 and
>2002.  I don't recall anything from 1998.  I'm not
>saying there isn't.  I' just saying I don't recall right
>now.

>So you did some green slips, but any other
>grievances that you filed during that time?

A.     I don't remember.  I remember that I tried to file grievances and then I was told that a lot of [] the issues I was grieving aren't grievable.

Q.     So you just didn't write the grievance up?

A.     That or I did write it up and it came back that this is not a grievable issue or jail policy is not grievable.

See, the system is this: You write a grievance, and then a guard comes and talks to you first.  Then if it didn't get worked out there, then it would get put into the next level, sergeant, and then the next level, administration.

Well, what happened with me is a lot of the times I'd write something up, and then they's bring it back to me and say this isn't grievable.  Then I'd say, well, I want to appeal that.  Then the jail administer would say you can't appeal this, it's just plain and simple not a grievable issue.

Q.     This is all back in 1998 and 1999?

A.     Yep.  I think the -- I think I relied more on my attorneys than I did anything, because they said they's help me.

Stanley Aff., supra, Exhibit A, at 82:8-84:1.

Prachar has averred that he does "not recall any discussions with [the Plaintiff] regarding the effectiveness of the grievance process," and that he "certainly did not counsel him to refrain from filing grievances, nor did [he] ever return any grievance

to him without following the jail process and providing a written response to the grievance."  Id., Exhibit G  at ¶10.

Of course, on Summary Judgment, we are not empowered to resolve this factual conflict in the evidence which, we find, raises a genuine issue of material fact on the question of exhaustion.  See, e.g., Jenkins v. Winter, 540 F.3d 742, 750 (8th Cir. 2008)("This court [on Summary Judgment] does not weigh the evidence or make credibility determinations."), quoting Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008)("In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue."), citing Thomas v. Corwin, 483 F.3d 516, 526-27 (8th Cir. 2007); see also, Gander Mountain Co. v. Cabela's, Inc., 540 F.3d 827, 831 (8th Cir. 2008)("In ruling on a motion for summary judgment a court must not weigh evidence or make credibility determinations."), quoting Kenney v. Swift Transp., Inc., 347 F.3d 1041, 1044 (8th Cir. 2003), citing Anderson v. Liberty Lobby, Inc., supra at 255.

Our Court of Appeals has "only excused inmates from complying with an institution's grievance procedures when officials have prevented prisoners from utilizing the procedures, see Miller v. Norris, 247 F.3d 736 (8th Cir. 2001), or when officials themselves have failed to comply with the grievance procedures."  Gibson

v. Weber, 431 F.3d 339, 341 (8th Cir. 2005), citing Foulk v. Charrier, 262 F.3d 687 (8th Cir. 2001).   In Miller v. Norris, 247 F.3d 736, 738 (8th Cir. 2001), an inmate's Complaint was dismissed because he had failed to exhaust his remedies, and thereafter, the inmate requested grievance forms, but did not receive a response.   The Court concluded "that a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under [the PLRA], and that [the plaintiff's] allegations raise an inference that he was prevented from utilizing the prison's administrative remedies."   Id. at 740, citing Johnson v. Garraghty, 57 F. Supp.2d 321, 329 (E.D. Va. 1999), for the proposition that a "dispute as to whether prisoner plaintiff was prevented from exhausting remedies required an evidentiary hearing to determine whether remedies were 'available'").

In Foulk v. Charrier, supra at 698, the Court of Appeals found that the lower Court was without a sufficient factual basis on which to find that the plaintiff had exhausted his administrative remedies, where the plaintiff had alleged that prison officials had failed to respond to his informal resolution request.   The same result was reached in Conner v. Doe, 285 Fed.Appx. 304, 304 (8th Cir. 2008), after the Court determined that the "evidence was insufficient to establish failure to exhaust in the face of [the prisoner's] assertion in his verified complaint that he had filed at least two

relevant grievances but did not receive copies of them or responses to them."  Of course, we are mindful that, in <u>Lyon v. Vande Krol</u>, supra at 809,  the Court reiterated its ruling, in <u>Chelette v. Harris</u>, 229 F.3d 684, 688 (8th Cir. 2000), cert. denied, 531 U.S. 1156 (2001), "that [the PLRA] does not permit the court to consider an inmate's merely subjective beliefs, logical or otherwise, in determining whether administrative procedures are 'available.'"

Were the Record before us solely limited to Prachar's testimony as we have quoted it, then we could conclude that, as was the case in <u>Vande Krol</u>, Prachar was not denying the Plaintiff the right to grieve, but was, "at best, a prediction that [the Plaintiff] would lose if he complained through the administrative grievance procedure."  <u>Lyon v. Vande Krol</u>, supra at 809.  Here, we are also presented with testimony that, for these purposes, we must construe in the Plaintiff's favor, and that, in conjunction with Prachar's "prediction," raises an inference that the Plaintiff was denied access to grievance forms, and had grievances returned to him on one or more occasions.  We are unable to distinguish, in any meaningful, or principled way, the purported acts of the Jail's staff, here, with those circumstances that our Court of Appeals has equated with a sufficient showing to require a factual resolution of whether a grievance procedure was "available" to an inmate.  Accordingly, we find

a genuine issue of material fact which precludes our holding, as a matter of law, that the Plaintiff failed to exhaust his administrative remedies, and we proceed to the merits of his Complaint.

        2.      The Law of the Case Doctrine.

        Before turning to the Plaintiff's constitutional claims, we first consider the extent to which the Court of Appeals' ruling, in Hanks v. Prachar, supra, impacts upon the Plaintiff's claims.

        a.      Standard of Review.  "When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  Little Earth of the United Tribes v. United States Department of Housing and Urban Development, 807 F.2d 1433, 1441 (8th Cir. 1986), quoting Arizona v. California, 460 U.S. 605, 618 (1983).  The law of the case doctrine prevents relitigation of the issues,  preserves the expectations of the parties, creates uniformity in decisions, and promotes judicial efficiency.  See, Maxfield v. Cintas Corp., No. 2, 487 F.3d 1132, 1135 (8th Cir. 2007); First Union National Bank v. Pictet Overseas Trust Corp., 477 F.3d 616, 620 (8th Cir. 2007); Little Earth of the United Tribes v. United States Department of Housing and Urban Development, supra at 1441.

- 27 -

"The doctrine applies to appellate decisions as well as to final decisions by the district court that have not been appealed."   First Union National Bank v. Pictet Overseas Trust Corp., supra at 620, citing Mosley v. City of Northwoods, 415 F.3d 908, 911 (8th Cir. 2005), and Little Earth of the United Tribes v. United States Department of Housing and Urban Development, supra at 1441.   "The doctrine does not apply to interlocutory orders, however, for they can always be reconsidered and modified by a district court prior to entry of a final judgment."   United States v. Hively, 437 F.3d 752, 766 (8th Cir. 2006), citing Murr Plumbing Inc. v. Scherer Bros. Financial Services Co., 48 F.3d 1066, 1070 (8th Cir. 1995).

On remand, a District Court is to strictly follow a Court of Appeals' mandate. See, Bethea v. Levi Strauss and Co., 916 F.2d 453, 456 (8th Cir. 1990), citing In re Sanford Fork & Tool Co., 160 U.S. 247, 255 (1895); Houghton v. McDonnell Douglas Corp., 627 F.2d 858, 864 (8th Cir. 1980); Piambino v. Bailey, 757 F.2d 1112, 1119 (11th Cir.1985), cert. denied 476 U.S. 1169 (1986).   A Court of Appeals mandate includes everything decided either expressly, or implicitly by necessity. See, In re MidAmerican Energy Co., 286 F.3d 483, 487 (8th Cir. 2002);   Triple Five of Minnesota , Inc. v. Simon, 2006 WL 1283833 * 4 (D. Minn., May 9, 2006).   A Court can consider a previously decided issue only if there is substantially different

- 28 -

evidence, or the decision is erroneous, and works a manifest injustice.  See, <u>Maxfield v. Cintas Corp., No. 2</u>, supra at 1135; <u>Little Earth of the United Tribes v. United States Department of Housing and Urban Development</u>, supra at 1441.

    b. <u>Legal Analysis</u>.  The Court of Appeals has already decided legal issues, which are important to this case.  As we have noted, the Court determined that the Jail's policy was consistent with the requirements set forth in <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979).  See, <u>Hanks v. Prachar</u>, supra at 776.  However, the Court also found that the Plaintiff's alleged behavior, including verbal threats, property damage, and excessive phone calls, did not justify long periods of restraint.  <u>Id.</u> at 775.  As a consequence, the Court found that there were trialworthy issues concerning the application of the Jail's restraint policy to the Plaintiff.  <u>Id.</u> at 776.

  The Defendants have not proffered substantially different evidence, and the Court of Appeals' decision cannot be characterized as either erroneous, or working a manifest injustice.  The Defendants contend that discovery has produced new evidence that differs greatly from the pre-discovery evidence.  See, <u>Memorandum in Support</u>, supra at 5-12.  Despite the Defendants' claim, neither party has advanced substantially different evidence so as to justify an abandonment of the decision in

<u>Hanks v. Prachar</u>, supra.  Accordingly,  we are bound to strictly follow the Court of Appeals' mandate.

Although the Court concluded that there were trialworthy issues, it did not explain how those issues affected the Plaintiff's Fourth, Eighth, and Fourteenth Amendment claims.  Accordingly, we must determine if there is a genuine issue of material fact as to whether the Defendants' application of their restraint policy violated the Plaintiff's constitutional rights.

       3.    <u>The Plaintiff's Constitutional Claims</u>.  In his Amended Complaint, the Plaintiff asserts claims against the Defendants, in their individual capacities, for the alleged violation of his Fourth, Eighth, and Fourteenth  Amendment rights.  See, <u>Amended Complaint</u>, supra ¶ 1.  In addition, although  not specifically identified as a separate claim by the Plaintiff, his Amended Complaint also asserts violations of his Due Process rights.  We turn to address each of the Plaintiff's claims, under the Fourteenth Amendment.[8]

---

[8]Although the parties have considered the Plaintiff's constitutional claims under the Fourth and Eighth Amendments, all of his constitutional claims are more appropriately brought pursuant to the Fourteenth Amendment's Due Process Clause, because the Plaintiff was a pretrial detainee during his time at the Jail.  See, <u>Bell v. Wolfish</u>, supra at 535 n. 16; <u>Kahle v. Leonard</u>, 477 F.3d 544, 550 (8th Cir. 2007), cert. denied sub nom. <u>Malone v. Kahle</u>, --- U.S. ---, 128 S.Ct. 201 (2007), citing <u>Owens v.</u>

(continued...)

a)      The Plaintiff's Claim of Excessive and Unreasonable Force.

1)      Standard of Review.  An excessive force claim is analyzed under the framework applicable to Fourth Amendment seizures.  See, McVay ex rel. Estate of McVay v. Sisters of Mercy Health System, 399 F.3d 904, 908 (8th Cir. 2005)("A seizure for Fourth Amendment purposes occurs when a government actor 'by means of physical force or show of authority * * * in some way restrain[s] the liberty of a citizen.'"), citing Graham v. Connor, 490 U.S. 386, 395 n.10 (1989). If a plaintiff is a pretrial detainee, then the excessive force claim is properly analyzed under the Due Process clause of the Fourteenth Amendment.  See, Graham v. Conner, 490 U.S. 386, 395 n. 10 (1989).  While the law is clear, that a pretrial detainee cannot be punished, see, Bell v. Wolfish, supra at 535, "not every disability that is imposed during pretrial detention amounts to 'punishment' in the Constitutional sense."  Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996).

---

[8](...continued)
Scott Jail, 328 F.3d 1026, 1027 (8th Cir. 2003).  As expressly recognized by our Court of Appeals, "[a]lthough some courts have applied Eighth Amendment principles in evaluating conditions under which unconvicted persons are imprisoned, the Supreme Court has recently held that such conditions are to be judged by the due process standard of the Fifth and Fourteenth Amendments."  Campbell v. Cauthron, 623 F.2d 503, 505 (8th Cir. 1980), citing Bell v. Wolfish, supra.

"The alleged use of excessive force is generally an issue of fact." Duncan v. Storie, 869 F.2d 1100, 1103 (8th Cir. 1989), cert. denied, 493 U.S. 852 (1989), citing Patzner v. Burkett, 779 F.2d 1363, 1371 (8th Cir. 1985).  Excessive force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments, rather than the Fourth Amendment, rely on an objective reasonableness standard, Andrews v. Neer, 253 F.3d 1052, 1060 (8th Cir. 2001), and the relevant inquiry is whether the law enforcement officers acted in a reasonable manner, in light of the facts and circumstances that confronted them.[9]  See, Moore v. Novak, 146 F.3d

---

[9]The Plaintiff has also raised an excessive force claim under the Eighth Amendment.  See, Amended Complaint, supra, ¶17.  However, a pretrial detainee's claims of excessive force are analyzed "under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's cruel and unusual punishment standard which is used for convicted prisoners."  See, Johnson v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989), citing Bell v. Wolfish, supra at 535.  Stated otherwise, "[e]xcessive-force claims brought by prisoners fall under the protections provided by the Eighth Amendment's prohibition of cruel and unusual punishment."  Andrews v. Neer, supra at 1061, citing Whitley v. Ablers, 475 U.S. 312, 318-22 (1986).  "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."  Bell v. Wolfish, supra 537 n. 16, quoting Ingram v. Wright, 430 U.S. 651, 671-72 n.40 (1977).

Since the Plaintiff had not been criminally prosecuted, at the time when the alleged violations occurred, his excessive force claim is properly analyzed under the Fourteenth Amendment.  Resort to the Fourteenth Amendment, however, does not meaningfully change the analysis that is applicable to Eighth Amendment claims.

(continued...)

531, 535 (8th Cir. 1998)("[T]he question for the [fact finder] is whether, judging from the perspective of a reasonable officer at the scene * * * , the totality of the circumstances justifies the amount of force used."); Johnson-El v. Schloemehl, 878 F.2d 1043, 1048 (8th Cir. 1989).

"Officers are permitted to use force reasonably in a good-faith effort to maintain or restore discipline, as long as they do not use force maliciously or sadistically to cause harm." Johnson v. Hamilton, 452 F.3d 967, 972 (8th Cir. 2006). "One acts maliciously by undertaking, without just cause or reason, a course of action intended to injure another; in contrast, one acts sadistically by engaging in extreme or excessive cruelty or by delighting in cruelty." United States v. Miller, 477 F.3d 644, 647 (8th Cir. 2007), quoting Howard v. Barnett, 21 F.3d 868, 872 (8th Cir. 1994). "In deciding whether a particular use of force was reasonable, we consider whether there was an objective need for force, the relationship between the need and the amount of force used, the threat reasonably perceived by correctional officers, the

---

(...continued)

See, Andrews v. Neer, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendment rather than the Fourth Amendment, also relies on an objective reasonableness standard."), citing Johnson-El v. Schoemehl, 878 F.2d 1043, 1048-49 (8th Cir. 1989).

efforts by the officers to temper the severity of the forceful response, and the extent of the inmate's injuries." Johnson v. Hamilton, supra at 972; see also, Walker v. Bowersox, 526 F.3d 1186, 1188 (8th Cir. 2008).

Even if the officers' force was unreasonable, the plaintiff must suffer an actual injury from the application of that force. See, Hanig v. Lee, 415 F.3d 822, 824 (8th Cir. 2005), citing Dawkins v. Graham, 50 F.3d 532, 535 (8th Cir. 1995). For example, the application of handcuffs must cause more than minor injuries in order to constitute excessive force. See, Crumley v. City of St. Paul, 324 F.3d 1003, 1008 (8th Cir. 2003). "Allegations of pain as a result of being handcuffed, without some evidence of more permanent injury," are insufficient to support a claim for excessive force. Hanig v. Lee, supra at 824, citing Foster v. Metropolitan Airports Commission, 914 F.2d 1076, 1082 (8th Cir. 1990). As a consequence, there is a de minimis component in our analysis. See, Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006)("[B]ecause some force was reasonably required to arrest and handcuff [the plaintiff], his relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition were de minimis injuries that support the conclusion that [the defendant] did not use excessive force."), citing Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005).

2)    Legal Analysis.  Although the Plaintiff contends that his injuries were as a result of the time he spent in restraints, he has offered no medical evidence, or clinical records, to support that claim.  As we have noted, in a claim for excessive force, based upon the use of handcuffs, there must be an actual, non-minor injury.  See, Hanig v. Lee, supra at 824; Crumley v. City of St. Paul, supra at 1008.  Allegations of pain or injury without proof in the form of medical records, or by other competent evidence, cannot prove an injury.  See, Foster v. Metropolitan Airports Commission, supra at 1082 (medical records required for the plaintiff to prove claimed nerve damage from being handcuffed too tightly); Crumley v. City of St. Paul, supra at 1008 (concluding that the plaintiff's claim, that her hand bled from being handcuffed to tightly, failed without medical records supporting a long term injury; Montes v. Ransom, 219 Fed.Appx. 378, 381 (5th Cir. 2007), cert. denied, --- U.S. ---, 128 S.Ct. 705 (2007)("Admissible medical evidence establishing some injury is required to satisfy the injury requirement of an excessive force claim based on the application of handcuffs."); McDonald v. Lewis, 2006 WL 2088160 at *4 (D. Minn., July 25, 2006)(claims of a dislocated jaw and a bruised kidney were not accepted, because they were not supported by medical records); Oliver v. City of Minneapolis, 2005 WL 2406035 at * 6 (D. Minn., September 27, 2005)(The plaintiff's claimed

permanent injuries were deemed temporary, minimal injuries, because they were not supported by medical records).

Although many of the cases we cite concern the use of handcuffs when arresting an individual, they are applicable to the Plaintiff's case because, whenever he was restrained, the Defendants employed handcuffs.  The Plaintiff's alleged medical injuries -- for marks on his wrist, ankle, and muscle cramps -- are de minimis injuries, and the Plaintiff's alleged permanent injuries are not supported by any medical evidence.  Since the Plaintiff has failed to produce evidence of any serious or permanent injury, his claim for excessive force necessarily fails, and therefore, we recommend that the Defendants be awarded Summary Judgment on that claim.

      b)    Deliberate Indifference To the Plaintiff's Medical Needs.

      1)    Standard of Review.  Under the Fourteenth Amendment, pretrial detainees are guaranteed as much protection as are convicted prisoners under the Eighth Amendment.[10]  See, Hartsfield v. Colburn, 371 F.3d 454,

_____

[10]We make plain that, while we rely on Eighth Amendment cases, we do so because the standards applicable to prisoners are also applicable to pretrial detainees under the Fourteenth Amendment.  See, Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006)("After Bell [v. Wolfish, supra] noted the difference between Substantive Due Process and the Eighth Amendment protections, we have recognized it is an open

(continued...)

- 36 -

456-57 (8th Cir. 2004); <u>Spencer v. Knapheide Truck Equipment Co.</u>, supra at 906;  see also, <u>Vaughn v. Greene County, Arkansas</u>, supra at 850; <u>Hott v. Hennepin County, Minnesota</u>, supra at 905.

It is well-established that deliberate indifference to a prisoner's serious medical needs is prohibited by the Eighth Amendment.  See, <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976);  <u>Albertson v. Norris</u>, 458 F.3d 762, 765 (8th Cir. 2005).  "A prisoner's Eighth Amendment rights are violated if prison officials show 'deliberate indifference' to the prisoner's 'serious medical needs.'"  <u>Olson v. Bloomberg</u>, 339 F.3d 730, 735 (8th Cir. 2003), quoting <u>Estelle v. Gamble</u>, supra at 106.  To prevail on a claim of constitutionally inadequate medical care, an inmate must "demonstrate (1) that [he] suffered  objectively serious medical needs and (2) that the prison officials

---

[10](...continued)

question but have repeatedly applied the deliberate indifference standard of Estelle [v. Gamble, 429 U.S. 97 (1976)] to pretrial detainee claims that prison officials unconstitutionally ignored a serious medical need or failed to protect the detainee from a serious risk of harm."), citing <u>Vaughn v. Green County</u>, 438 F.3d 845, 850 (8th Cir. 2006), and <u>Whitnack v. Douglas County</u>, 16 F.3d 954, 957 (8th Cir. 1994) [collecting cases]; see also, <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 850 (1998) ("Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial.").

actually knew of but deliberately disregarded those needs." Dulaney v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997), citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); Crow v. Montgomery, 403 F.3d 598, 602 (8th Cir. 2005); Pagels v. Morrison, 335 F.3d 736, 740 (8th Cir. 2003);  Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001).

"Deliberate indifference may be manifested by prison doctors in responding to the prisoner's needs or by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002).  However, "[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000), quoting Estate of Rosenburg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); see also, Smith v. Clarke, 458 F.3d 720, 724 (8th Cir. 2006); Roberson v. Bradshaw, 198 F.3d 645, 647 (8th Cir. 1999)("'Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.'"), quoting Dulaney v. Carnahan, supra at 1239; DeGidio v. Pung, 920 F.2d 525, 532 (8th Cir. 1990)("[T]he eighth amendment does not transform medical malpractice into a constitutional claim.").

2)  <u>Legal Analysis</u>.  The Plaintiff makes two (2) claims concerning a deliberate indifference to his serious medical needs.  The first is that he suffered injuries from the use of restraints, and metal chains, that were left untreated despite repeated requests for medical care.  See, <u>Amended Complaint</u>, ¶¶ 8, 10.  The second is that the Plaintiff did not receive medical treatment for his mental illness, even though the Defendants were aware of that illness.  <u>Id.</u> ¶13.

As to the Plaintiff's first claim, his own statements refute any allegation that the prison officials knew, and deliberately disregarded, his serious medical needs.  See, <u>Jolly v. Knudson</u>, 205 F.3d 1094, 1096 (8th Cir. 2000); <u>Dulaney v. Carnahan</u>, supra at 1239.  The Plaintiff has represented that he requested to see medical doctors "a lot." <u>Stanley Aff.</u>, supra, Exhibit A at 61:2-3.  The Plaintiff's medical visits were reduced when he repeatedly acted out.  <u>Id.</u> at 61:4-16.  Furthermore, there is no evidence that the Plaintiff's alleged injuries rose to the level of an objectively serious medical need.  An objectively serious medical need must be supported by medical evidence, such as a physician's diagnosis, or a medical condition that would be obvious to a lay person. See, <u>Grayson v. Ross</u>, 454 F.3d 802, 809 (8th Cir. 2006), citing <u>Aswegan v. Henry</u>, 49 F.3d 461, 464 (8th Cir. 1995); <u>Pool v. Sebastian County, Ark.</u>, 418 F.3d 934, 944 (8th Cir. 2005).  The Plaintiff's maintains that his alleged medical injuries stem from being

placed in restraints, but those asserted injuries are not supported by any medical evidence, nor would they have been obvious to a lay person as requiring medical attention.  See, <u>Stanley Aff.</u>, supra, Exhibit A, 31:7-12 (headaches); 84:2-18 (cuts); 94:15-20 (muscle cramps).

Moreover, most of the alleged injuries received treatment, and the Plaintiff was satisfied with the treatment that he received.  <u>Id.</u> 36:9-12; 84:2-18; 94:11-24.  Lastly, the Plaintiff's alleged injuries, and their asserted lack of treatment, do not rise to the level of deliberate indifference when compared to cases which have survived Summary Judgment.  See, <u>Hartsfield v. Colburn</u>, supra at 457-58 (Summary Judgment precluded where it took six (6) weeks, after written requests, for the pretrial detainee to receive care, and that delay caused the detainee pain and infection); <u>Boyd v. Knox</u>, 47 F.3d 966, 969 (8th Cir. 1995)(Summary Judgment denied as to prison dentist who took three (3) weeks to complete a referral sheet to an oral surgeon, after obtaining knowledge of the inmate's pain and suffering); <u>Foulks v. Cole County, Mo.</u>, 991 F.2d 454, 457 (8th Cir. 1993)(Summary Judgment denied where, upon being transferred to a jail after being treated at a hospital for a head injury, treatment was delayed even after the hospital provided a sheet detailing the pretrial detainee's treatment, requests from the detainee's mother, and after correctional staff were notified that the detainee

- 40 -

was feeling sick, and vomiting blood).  No even vaguely similar evidence is presented here, and therefore, the Plaintiff's first claim is without merit.

The second claim is equally meritless.  The Plaintiff claims that the correctional staff knew of his mental illness, and deliberately withheld medical care.  When the Plaintiff arrived at the Jail, the staff did not immediately have medication for his mental illness.  See, Stanley Aff., supra, Exhibit A, at 36:15-37:20.  It took some time, but the Plaintiff was able to see a medical doctor, and eventually, was administered a number of different medications.  Id. at 37:21-38:17.  Furthermore, the Plaintiff has failed to offer any evidence to show that the corrections officials knew he was mentally ill.  At one point during the Plaintiff's detainment, he was sent to the Brainerd State Hospital for a mental evaluation.  Id. at 77:2-11.  The evaluation determined that he was not mentally ill.  Id. at 77:2-11, 120:12-16.  The Plaintiff even informed correctional staff that the evaluation had demonstrated that he was not mentally ill.  See, Stanley Aff., supra, Exhibit B, Attachment 3, at 1.

The Plaintiff also advised that it was rare for him to discuss his mental health with Prachar.  Id. Exhibit A at 80:15-19.  As noted by the Defendants, prison officials are not expected to substitute their judgment for a medical professional's opinion.  See, Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002), citing Zentmyer v.

Kendall County, 220 F.3d 805, 812 (7th Cir. 2000).  Here, medical professionals had determined that the Plaintiff was not mentally ill, and therefore, it was not the correction officials' responsibility to investigate some other diagnosis.  Thus, the Plaintiff's claims for deliberate indifference to his medical needs is without merit.

   c) Procedural Due Process.  The heart of the Plaintiff's action rests on his claim that he was unnecessarily held in restraints to such an extent as to violate his substantive due process rights.  In contrast, the Defendants urge that the Plaintiff was such a problem inmate, that they were well within their rights to restrain him for such amount of time as would ensure his safety, the safety of other inmates and the Jail's staff, and as would assure the security of the Jail, and its orderly operation.

   1) Standard of Review.  "[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action."  Youngberg v. Romeo, 457 U.S. 307, 316 (1982).  Accordingly, "[t]he Due Process Clause of the United States Constitution prohibits the punishment of persons prior to a judgment of conviction."  Villanueva v. George, 659 F.2d 851, 853 (8th Cir. 1981).  However, neither the "[l]oss of freedom of choice and privacy," nor an interference "with the detainee's understandable desire

to live as comfortably as possible and with as little restraint as possible during

confinement," amount to punishment.  Bell v. Wolfish, supra at 537.  Instead, the

question is "whether the disability is imposed for the purpose of punishment or

whether it is but an incident of some other legitimate governmental purpose."  Id.

Simply stated, "not every disability imposed during pretrial detention amounts to

'punishment' in the constitutional sense."  Smith v. Copeland, 87 F.3d 265, 268 (8th

Cir. 1996).

      As the Court explained, in Bell v. Wolfish, supra at 538-40:

> A court must decide whether the disability is imposed for
> the purpose of punishment or whether it is but an incident
> of some other legitimate governmental purpose.   See
> Flemming v. Nestor, supra, 363 U.S.[ 603,] at 613-617, 80
> S.Ct. [1367,] at 1374-1376 [(1960)]. * * * [I]f a particular
> condition or restriction of pretrial detention is reasonably
> related to a legitimate governmental objective, it does not,
> without more, amount to "punishment."   Conversely, if a
> restriction or condition is not reasonably related to a
> legitimate goal -- if it is arbitrary or purposeless -- a court
> permissibly may infer that the purpose of the governmental
> action is punishment that may not constitutionally be
> inflicted upon detainees qua detainees.
>
>      *     *     *
>
> [W]e do not accept [the] argument that the Government's
> interest in ensuring a detainee's presence at trial is the **only**
> objective that may justify restraints and conditions once the

decision is lawfully made to confine a person. * * * The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained. These legitimate operation concerns may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial. * * * Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting a trial. We need not here attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention. It is enough simply to recognize that in addition to ensuring the detainees' presence at trial, the effective management fo the detention facility once the individual is confined is a valid objective that may justify the imposition fo conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.

"Absent an expressed punitive purpose, an intention to punish may nonetheless be imputed to jail officials if a disability imposed on an inmate is not reasonably related to a legitimate governmental objective" or an "incident of a legitimate nonpunitive governmental objective." Mann v. Smith, 796 F.2d 79, 82 (8th Cir. 1986), quoting Bell v. Wolfish, supra at 538-39.

2)      Legal Analysis.  We accept that "maintaining institutional security and preserving internal order and discipline are essential goals

that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." <u>Bell v. Wolfish</u>, supra at 546.  Given those salutary goals, "[p]rison administrators * * * should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Id.</u> at 547.  As the Court instructed in <u>Bell</u>, "Courts must be mindful that these inquiries [i.e., as to whether restrictions are reasonably related to legitimate goals, or are punishment] spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

Viewing the Record in its expanse, it becomes clear that, what the Defendants call measures for the preservation of institutional security, and internal order and discipline, the Plaintiff regards as arbitrary and unnecessary punishment, and each position finds evidentiary support.  During his incarceration in 1998 and 1999, the Plaintiff was nothing short of a jailer's worst nightmare.  See, <u>Affidavit of Prachar, Docket No. 32</u>, at ¶10 ("Mr. Hanks has been one of the more disruptive, uncooperative and non-compliant inmates the St. Louis County Jail has ever housed.").  By his own admission, the Plaintiff is "a very, very, very deep down very

aggressive person." <u>Stanley Aff.</u>, supra, Exhibit A, at 47:12-13.  He is also self-destructive, and has "a history of carving and cutting [him]self," <u>id.</u> at 58:15-16, has broken lightbulbs so as to cut himself, <u>id.</u> at 58:17-19, has threatened to use pencils to drive through his neck, <u>id.</u> at 58:9-16,and has used staples to injure himself, as "they are effective for suicide attempts and stuff like that."  <u>Id.</u> at 58:14-25.

Without attempting to exhaustively list his malevolence at the Jail, he has admitted to breaking two sets of handcuffs that were made of steel, <u>id.</u> at 40:15-20 and 66:24-25; to ripping a handicap-bar from a wall in order to break a window, and dislodge a showerhead so as to cause "hundreds of gallons of water" to flood the Jail, <u>id.</u> 41:12-20, and 42:11-14; to making bomb threats to a local hotel, <u>id.</u> at 68:10-21; to calling the Secret Service to threaten to blow up a Federal building in St. Paul, <u>id.</u> at 71:19-72:6; to calling the Immigration and Naturalization Service to report "that one of my friend's mom had a bunch of illegal immigrants working in her basement," <u>id.</u> at 72:8-10; to physically threatening Wietman with kicking her legs to hurt her, <u>id.</u> at 74:18-75:8, and to voicing another threat that "it's serious assaults from now on," and "no more game playing, that from now on I'm going to hurt somebody," as "he really did" "want to hurt people."  <u>Id.</u> at 75:9-23.

Overlying the physical acts of destruction, as well as the threats, the Plaintiff acknowledges that his conduct, whether it was "kicking the door in his cell," id. at 59:24-25, "making a lot of noise and being a noise maker, id. at 60:1-2, kicking his furniture "over and over again," id. at 49:9-15; throwing his food, id. at 40:17-20; or throwing of spitballs, was for the purpose of gaining attention.  Id. at 60:3-4. Moreover, the Plaintiff "just didn't follow the rules," and "was purposefully engaging in those activities because of the fact that [he] got a rise out of it and a huge lift and other people did, too." Id. at 74:5-14.  Moreover, the Plaintiff was aware that his unruliness "would cause disruption among the other people being held at the jail." Id. at 74:15-17.  As related by the Plaintiff, he was causing problems for the Jail when he was out of restraints, and was considerably less problematic when he was in restraints. Id. at 40:9-20.

Notwithstanding the Plaintiff's disobedient, rebellious, and destructive conduct, the Defendants have averred, as follows, that their response was measured, and constrained:

> The use of restraints on Plaintiff was the minimal amount believed to be necessary to prevent him from harming himself or others.  Plaintiff had a violent history, and when he initially came to the jail, his misuse of free time caused him to get into significant trouble.  His behavior impacted

other inmates and created a dangerous condition for the jail staff. As Plaintiff modified his behavior and complied with the safety requirements of the jail, his restrictions were reduced. During the time leading up to Plaintiff being fully free of restraints, he was only one-point restrained from 10 PM until 7 AM. He would sleep during this time period, and jail staff would perform frequent well-being checks on him during the night to make sure he was fine. This restraint seemed to be a minimal restriction on his daily activities and gave him time to control his behavior and not hurt himself.

<u>Stanley Aff.</u>, supra, Exhibit G, Supplement Affidavit of Prachar, at ¶13.

When asked, at his deposition, why the Plaintiff was handcuffed at night, Prachar responded:

As I recall, we took the approach with him because of his behavior that we would gradually reduce. And I recall talking to him about this. You know, the ball is in your court here, Clayton. Here's what we'll do if you don't do this and here's what you need to do to get there, and here's what we're going to do. And we took this approach because given what we've gone through to this point, you can see there's a pattern of consistent behavior on his part. And we wanted to get him to a point where he understands he needs to follow the rules and respect the staff. And so we gradually, as we move upwards from the 1-point to 3 -- 2-point to 4-point, to the padded cell, we wanted to take him down the same way to get to this point. * * * It's all based on his behavior. * * * That's why it occurred in this fashion. Gradually give him back his privileges.

<u>Stanley Aff.</u>, supra, Exhibit B, at 72:25-73:17.

According to the Defendants, during the Plaintiff's stay at the Jail in 1998, and 1999, the time that he spent in 4-point restraints was less than seven (7) days and, during the period from October 28, 1998, to his release on March 12, 1999 -- a period of four and one-half (4½) months -- no restraints were required on the Plaintiff.  See, Defendants' Memorandum in Support, Docket No. 101, at pp. 3, 5, and 24.

In contrast, the Plaintiff denies any assertion that he was only in 4-point restraints for seven (7) days.  As the Plaintiff testified:

> So I wasn't trying to say like they four pointed me every day.  I remember I was four pointed a lot more than seven days though.  That's something I don't agree with.  I think I read that somewhere, that Dave Prachar was trying to say that I only spent seven days in four point restraints.  That's not accurate.  To me it's not.  My memory of it was something more like a couple weeks at one point I had spent four pointed.

Stanley Aff., supra, Exhibit A, at 57:16-24.

Instead, the Plaintiff testified that he was "chained down" for substantially longer periods.  In the Plaintiff's words:

> I remember distinctly that it was like three weeks after I first got there I was chained down, then I spent periods chained down not for very long and then I spent about a 44-day straight period in some form of restraint.  Then after that, I remember there was a period where it was teetered out maybe four times altogether.  But I don't remember exactly off the top of my head.  I know the reason it's 44

days.  I remember when it happened it was several weeks, but when I count on the records that you guys got to me -- actually it was the other attorney.  He sent me -- the pages say he was chained on this day and he remained in chains this day and this day, and it actually breaks it all down how many days I spent chained.  so I remember that was the most excruciating one.  That was the long one.

Id. at 92:22-93:13.

As to that period of restraint, the following exchange occurred:

Q.    When you say 40-some days chained down, in what fashion are you talking, one point, two point, three point, four point?

A.    The reason it was so long was because I kept going back to four point.  You know, I'd be restrained in four point and I'd work my way down to like one or two point, and then something would happen, oh Hanks is yelling again, Hanks, your going to go back to four point.  so it was a fluctuation I remember.  I remember it was not all the time in four point restraints.

Q.    But the four point would be maybe 24 hours or so?

A.    Like 24 hours, 48 sometimes.

Q.    And then back to less?

A.    Then it would go to three point, yeah, and then if the next day I did good it would go to two point.  Then sometimes they's keep it at that for four days or so, and then I'd go to one point.  But then if anything happened, I'd jump right back to four point.

- 50 -

> Q.    You still had some time out of the cell unrestrained during that time period?

> A.    Well, no.  When I was chained down like that, they made me wear waist chains and shackles to do my recreation.

Id. at 78:10-79:10.

In the Plaintiff's view, the level of restraint was arbitrary:

> But the point being is the way I was being restrained was if I even f\*\*cked up at all a little bit, I go right back to four point.  If I yell to the nurse one too many times, I go right back to four point.  So as soon as I got caught kicking that [i.e., a metal desk] -- I mean it wasn't going to break.  It's made out of pure steel.  As soon as I got caught kicking that, I went right to restraints.  There wasn't a warning, there wasn't a stop, Hanks, just calm down.  It was right to restraints for days on end.

Id. at 50:10-19.

Similarly, the Plaintiff noted that, at times, he was chained at night, even though he had been unrestrained during the day:

> Q.    There were times when you were only restrained while you were sleeping, too, right?

> A.    Yeah, there was periods.  That was toward the end of my chaining, too.  They literally meant work my way out of it, like work your way out of it -- even like I remember I'd get chained at nighttime and then during the day they would let me stay in the cell all day long and then one hour out in the day space.  But then at nighttime I'd go back in chains or restraints,

- 51 -

> one or two point.  I can't remember what it was.  It
> was more degrading than it was punishment, I guess.
> I don't know what it was.  It seemed weird to me.

<u>Id.</u> at 79:16-80:3.

If not degrading, the Plaintiff felt that the chaining was malicious:

> Q.   Were you already in restraints when the would come
>      in though or did they put you in restraints?
>
> A.   Most of the time they would prolong my restraints.
>      They'd know I'd work my ass off to get down to one
>      point restraint, and then one thing would happen and
>      instead of just letting it go or helping me or saying,
>      Hanks, calm down[,] it []was right back to four point
>      restraints.  There was no questions asked.  I felt like
>      they did that maliciously.  They did it purposely.
>      They knew how bad it hurt me.

<u>Id.</u> at 63:9-20.

Overall, Hanks has averred to his estimate that, "for at least 70% to 80% of the time

he was incarcerated at the St. Louis County Jail," he was "under some sort of restraint,

ranging from one-point to four-point.  <u>Verified Amended Complaint, Docket 77</u>, at

p. 2 ¶9.

   While the evidence before us is more voluminous than that reviewed previously

by the Court of Appeals, generically similar, highly counterpoised, evidence was

presented then, causing the Court to conclude that a genuine issue of material fact was

raised "as to whether defendants punished Hanks (age 17 during most of the period

at issue) by using one- to four-point restraints for long intervals when he was also locked down, and by periodically confining him in the padded unit." Hanks v. Prachar, supra at 775. Even though we have already determined that, given the paralleling evidence that was developed through discovery, post-appeal, the Court of Appeals' conclusion forms the law of this case, we would have reached that same conclusion, that this case involves Jury issues, even if we were reviewing the evidence as a matter of first impression. To recommend a grant of Summary Judgment, we would be obligated to resolve disputed issues of fact, a function we cannot perform on Summary Judgment. See, Jessie v. Potter, 516 F.3d 709, 712 (8th Cir.2008)("[A] motion for summary judgment may not resolve disputed fact issues * * *."), citing Rule 56(c), Federal Rules of Civil Procedure. Accordingly, we find no basis upon which to recommend Summary Judgment on this ground.[11]

---

[11]In their Memorandum, the Defendants argue that "the allegations contained in the amended complaint fail to specifically identify actions that each Defendant took in violation of Plaintiff's constitutional rights," and "[l]ikewise, Plaintiff's testimony during his deposition fails to identify any constitutional violations that would be attributed to the individual defendants (as opposed to the county under a Monell claim.")[emphasis in original]. We disagree. The Plaintiff specifically identified Wietman as one of the Jail's staff members who he felt was maliciously restraining him, see, Stanley Aff., supra, Exhibit A, at 63:1-20, and he identified Prachar as the "one okaying most of the stuff." Id. at 63:21-64:3. We appreciate the Plaintiff was not asked how he learned that Prachar was directly involving in approving the level
(continued...)

- 53 -

5.   <u>Qualified Immunity</u>.  Lastly, the Defendants contend that they are entitled to qualified immunity, as a matter of law.  "The law of our circuit is clear," that "[t]he issue of qualified immunity is a question of law for the court, rather than the jury to decide:  "[I]t is the province of the jury to determine disputed predicate facts, the question of qualified immunity is one of law for the court."  <u>Littrell v. Franklin</u>, 388 F.3d 578, 585-85 (8ᵗʰ Cir. 2004).   Notwithstanding the rule, that qualified immunity is for the Court to decide as a matter of law, Courts may not determine that issue when the facts are in dispute.  As the Court recognized, in <u>Arnott v. Mataya</u>, 995 F.2d 121, 124 (8ᵗʰ Cir. 1993):

> If the arrestee challenges the officer's description of the facts and presents a factual account where a reasonable officer would **not** be justified in making an arrest, then a material dispute of fact exists.  Where there is a genuine issue of material fact surrounding the question of plaintiff's conduct, we cannot determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law.

---

[11](...continued)

of restraint, but the Plaintiff did identify Prachar as the creator of the Plaintiff's SMP, which governed his restrained, or unrestrained, status.  Moreover, during the course of her deposition, Wietman identified Prachar as the one making the decisions to place the Plaintiff in restraints.  See, <u>Stanley Aff.</u>, supra, Exhibit C, at 7:19-8:3.  We find these showings adequate to recommend a denial of the Defendants' Motion to dismiss the individual capacity claims against Prachar and Wietman.

[Emphasis in original], citing, <u>Gainor v. Rogers</u>, 973 F.2d 1379, 1384-85 (8th Cir. 1992); see also, <u>Hill v. Scott</u>, 349 F.3d 1068, 1071-72 (8th Cir.2003); <u>Goff v. Bise</u>, 173 F.3d 1068, 1073 (8th Cir. 1999).

Here, we are unable to determine the intensity and duration of the Plaintiff's restraint at the Jail.  He has testified to a greater, and longer, degree of restraint, while the Defendant denies the accuracy of the Plaintiff's account.  As a result, whether the Defendants are entitled to qualified immunity, as a matter of law, involves genuine issues of material fact which preclude the grant of Summary Judgment.

Of course, if the clearly established law, at the time of the Plaintiff's incarceration in 1998 and 1999, warranted a Judgment in the Defendants' favor, even if were to accept the Plaintiff's version of the facts as true, then the disputed facts would not preclude Summary Judgment.  The clearly established law, however, did not so hold -- even in 1998 and 1999.  For example, in <u>Putnam v. Gerloff</u>, 639 F.2d 415 (8th Cir. 1981), two pretrial detainees sued a sheriff, and the sheriff's deputy, for chaining, and handcuffing, them over night.  The two plaintiffs had been caught in the midst of their attempt to hacksaw themselves out of the jail, where they were being detained as they awaited a trial on charges of armed robbery.  Following the foiled escape, the plaintiffs were chained and handcuffed in a cell, for twelve (12) to thirteen

(13) hours, and deprived of access to toilet facilities,[12] and they sued the sheriff and

deputy under Section 1983.  The Trial Court had directed a Verdict in favor of the

deputy, and had provided the Jury with instructions, as to the remaining claim against

the sheriff, which the Court of Appeals found to be in error.

In addressing the evidence, which was less contested than that presented here,

the Court reasoned as follows:

> Thus a proper instruction on the overnight chaining would
> have told the jury that as pretrial detainees, [the plaintiffs]
> had the right not to be punished.  If the plaintiffs were
> chained overnight to be punished, they were then deprived
> of liberty without due process.  The jury may find direct
> evidence of intent to punish, or it may infer that this intent
> existed if it finds that the overnight chaining was not
> reasonably related to insuring the presence of [the
> plaintiffs] at trial and preserving the security of the jail, or
> if those purposes could have been achieved by alternative
> and less harsh standards.

Id. at 420.

The Court vacated the Judgment below, and "remanded for a new trial as against both

defendants."[13]  Id. at 424.  Similarly, in Villaneuva v. George, 659 F.2d 851 (8th Cir.

---

[12]The Plaintiff also testified that Weitman purposely made him wait to use the
restroom for long periods of time.  See,  Stanley Aff., supra, Exhibit A, at 51:12-24.

[13]On remand, the Jury returned a Verdict for the defendants, and the plaintiffs
appealed, arguing in part, that they should have been directed a Verdict in their favor
(continued...)

1981), the Court, sitting en banc, reversed the grant of a Directed Verdict in favor of

certain of the defendants, who were correctional officers, as Jury issues existed as to

whether the conditions of confinement for a pretrial detainee "were unnecessarily

excessive and bore no reasonable relation to a legitimate government interest." Id. at

854. Plainly, the conditions of cell confinement, if excessively onerous, could be the

basis of a Substantive Due Process claim by pretrial detainees, which was the

governing law since Bell was decided in 1979 -- nearly twenty (20) years before the

Plaintiff's confinement at the Jail.

Therefore, given the state of the law in 1998 and 1999, we recommend that the

Defendants' Motion for Summary Judgment on qualified immunity grounds be denied

owing to the existence of genuine issues of material fact.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Defendants' Motion for Summary Judgment [Docket No. 99] be

granted as to all of the Plaintiff's claims, except his claim against the Defendants, in

---

[13](...continued)
on the issue of liability. The Court of Appeals disagreed, noting "that a jury question
was clearly presented as to whether the measures taken were no more severe than was
reasonably necessary under the circumstances," which is the same conclusion we
reach here. Putnam v. Gerloff, 701 F.2d 63, 66 (8th Cir. 1983).

their individual capacities, for alleged due process violations arising from the intensity

and duration of his restraints while an inmate at the St. Louis County Jail in 1998 and

1999.

Dated:  February 13, 2009                    s/Raymond L. Erickson
                                          Raymond L. Erickson
                                          CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.2(b), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties **by no later than**

**March 2, 2009,** a writing which specifically identifies those portions of the Report to

which objections are made and the bases of those objections.  Failure to comply with

this procedure shall operate as a forfeiture of the objecting party's right to seek review

in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a

Hearing, then the party making the objections shall timely order and file a complete

- 58 -

transcript of that Hearing **by no later than March 2, 2009,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.